**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

THE PIATELLI COMPANY, INC, et al.,

    Plaintiffs,

v.

ALAN CHAMBERS and LAURA CHAMBERS,

    Defendants.

3:12-cv-225-RCJ-WGC

**ORDER**

This case involves a dispute between the members of an LLC regarding an attempt to sell a gold mine. Currently before the Court is a motion for a preliminary injunction (#7). For the following reasons, the motion for a preliminary injunction is granted.

## BACKGROUND

In 2006 and early 2007, Defendant Alan Chambers ("Chambers") sought to have Mario Piatelli, Jack Frost, Robert Dierking, and J.D. Hunt (the "Investors") invest in a gold mine (the "Mine") he owned which is located near Hawthorne, Nevada. (Piatelli Decl. (#7) at 24). A Joint Agreement was executed on March 8, 2007 by Chambers and the Investors. (Piatelli Decl. (#7) at 24; Joint Agreement (#7) at 40). Pursuant to the Joint Agreement, Chambers conveyed the Mine to the recently formed Lucky Boy Mining and Development, LLC ("Lucky Boy") in exchange for an eighty percent ownership interest in Lucky Boy and $30,000 from the Investors, among other benefits. (Piatelli Decl. (#7) at 24, 26).

An Operating Agreement was executed the same day and provided that the management and control of Lucky Boy would be placed in the hands of a management committee made up of all five of its members. (Operating Agreement (#7) at 45-46). A

majority vote of the members was to control all aspects of managing the company and Piatelli was appointed as president by a majority of the members. (*Id.*; Piatelli Decl. (#7) at 25). The members agreed that the purpose of Lucky Boy was to develop the geological information regarding the gold reserve and profitability of mining and then market the Mine for a price between $3,000,000 and $5,000,000. (Piatelli Decl. (#7) at 24; Joint Agreement (#7) at 41).

Piatelli and Frost then began an aggressive program to find a large investor or buyer. (Piatelli Decl. (#7) at 25). Although Piatelli and Frost spoke with dozens of prospects all over the world and reviewed several offers, none of the offers were for cash, but were tied in with a period of lease during which the lessee could pay in stock or ore recovered from the Mine. (*Id.* at 28). During this period, Chambers apparently operated the Mine without any permits and without providing an accounting to the Investors, failed to respond to requests for information from the Investors, locked the Mine and refused to provide a key to the Investors, denied the Investors the ability to inspect the Mine, and even attempted to sell the Mine without approval of the Investors. (Frost Decl. (#7) at 135-36).

In late 2010, Dr. Victor Asai—a representative of The Yasheng Group ("Yasheng")—contacted Piatelli and Frost about the Mine. (Asai Decl. (#7) at 153). After initial discussions about the Mine, the chairman and president of Yasheng traveled to visit the Mine on November 18, 2011. (Piatelli Decl. (#7) at 31). Dierking contacted Chambers to open the Mine for the visit and told Chambers that Yasheng was interested in purchasing the Mine. (Dierking Decl. (#7) at 143). Chambers reacted negatively to this information and stated he did not want to sell the property. (*Id.*).

In February 2012, Yasheng and Lucky Boy entered into an Option to Lease agreement and a Lease and Purchase Option agreement. (Option to Lease (#7) at 114; Lease and Purchase Option Agreement (#7) at 121). The Option to Lease agreement provided for a ninety day due diligence period for Yasheng, and if satisfactory Yasheng could elect to lease the property under the Lease and Purchase Option agreement by paying $500,000 and could at any time during the eighteen month lease period exercise the option to purchase by paying the balance of $4,000,000. (Option to Lease (#7) at 114; Lease and Purchase Option

2

Agreement (#7) at 121-22). The Option to Lease does not permit Yasheng to extract ore, but only permits it to do a more in-depth investigation of the Mine. (Option to Lease (#7) at 114).

Dr. Asai later called Chambers to arrange for him to open the Mine for Yasheng's executives and professionals. (Asai Decl. (#7) at 155). During that conversation, Chambers represented that he owned eighty percent of the Mine itself (not of Lucky Boy) and that Chambers would not open the Mine unless he saw a contract. (*Id.*). A meeting was set for March 8, 2012 for the president and chairman of the Yasheng board to appear with four geologists, Dr. Asai, Lucky Boy's geologist, two professional companies Yasheng had requested for proposals for the due diligence work (Summit Engineering and Broadbent Environmental), among others. (*Id.* at 156). During the meeting, the group desired to see a visible vein of gold that was 150 feet in length and .5 feet in width that was within a vertical shaft. (*Id.* at 157). Chambers instructed the group that they could not go there because it was "all snowed in." (*Id.*). The group proceeded to the shaft anyways and found it filled in with dirt. (*Id.*). Dr. Asai then asked where the shaft was located, to which Chambers responded "you are on top of it." (*Id.*). The group had apparently driven over the recently filled shaft without any warning from Chambers of the danger. (*Id.*). Chambers claimed he filled it in because of the risk of earthquakes, but the shaft has been open since the 1930s or 1950s without any harm from earthquakes. (*Id.*; Shaw Decl. (#7) at 147-48). The group was therefore not able to view the prominent vein of gold it desired to inspect.

After the visit to the Mine, the group met at a nearby hotel where Lucky Boy's geologist made a presentation regarding the Mine. (Dierking Decl. (#7) at 144). During this meeting, both Chambers and his wife Laura were very disruptive, claiming that they owned eighty percent of the Mine, knew nothing of any contract between Lucky Boy and Yasheng, that the Mine did not have the proper permits, and that Piatelli had committed fraud, forged the deed to the Mine, and that criminal charges and a lawsuit were being filed against him. (*Id.*; Asai Decl. (#7) at 158). Chambers and his wife were apparently so disruptive during the visit and subsequent meeting that the chairman and CEO of Summit Engineering informed Dr. Asai that Summit was unwilling to perform the due diligence work on the Mine at any time Chambers

1 is present, because he believed Chambers could not act responsibly and legally for mine
2 safety. (Gallagher Decl. (#7) at162-63).

3 Chambers and his wife created such doubt in the minds of the Yasheng executives
4 about the Mine at the March 8, 2012 visit that Dr. Asai decided to drive to Los Angeles,
5 California to meet with Piatelli and determine Chambers' authority. (Asai Decl. (#7) at 159).
6 Before leaving, Chambers and his wife approached Dr. Asai and told him that Chambers had
7 another mine for sale that he would offer to sell to Yasheng. (*Id.*). Dr. Asai instructed them
8 that there would be no further discussions until the matter was resolved and that Yasheng may
9 cancel the contract due to possible lawsuits among the Lucky Boy members. (*Id.*).

10 Upon arriving in Los Angeles, Piatelli provided Dr. Asai with copies of the deed and of
11 the Lucky Boy Operating Agreement, which authorized a majority of the management
12 committee to make decisions. (Asai Decl. (#7) at 159). Upon returning from Los Angeles,
13 Laura Chambers approached Dr. Asai and told him that she and Chambers wanted to do the
14 mining project, but would not pull any permits because they did not want the state to know
15 what they were doing. (*Id.* at 160). Dr. Asai instructed her to stop talking because Yasheng
16 requires all proper permits. (*Id.* at 160). Since that time, Chambers has repeatedly contacted
17 Yasheng's president by telephone attempting to negotiate with her. (Piatelli Decl. (#7) at 33).

18 Yasheng desires to complete its due diligence to determine whether it should exercise
19 its options and purchase the Mine, but the cost of due diligence is in excess of $300,000 and
20 Yasheng is reluctant to proceed if there are ongoing disputes between the Lucky Boy
21 members. (Asai Decl. (#7) at 160). Additionally, Yasheng only has a limited period of time
22 under the lease agreements in which it can conduct its due diligence.[1] (Option to Lease (#7)
23 at 114; Lease and Purchase Option Agreement (#7) at 121).

---

[1] It appears that the Option to Lease expires on May 6, 2012. (Option to Lease (#7) at 114; Piatelli Decl. (#7) at 34).

4

The Investors filed a complaint[2] in this Court on April 23, 2012 against Alan and Laura Chambers (collectively "Defendants"), alleging (1) breach of contract; (2) breach of the covenant of good faith and fair dealing; (3) breach of fiduciary duty; (4) interference with contractual relations; (5) interference with prospective economic advantage; (6) defamation; (7) that they are entitled to a temporary restraining order, preliminary injunction, and a permanent injunction; and (8) declaratory relief. (Compl. (#1)). The Investors filed a motion for a preliminary injunction on April 26, 2012.[3] (Mot. for Preliminary Injunction (#7)). A hearing was held on the motion on May 3, 2012.

## LEGAL STANDARD

Federal Rule of Civil Procedure 65(a) allows a court to issue a preliminary injunction on notice to an adverse party. "An injunction is a matter of equitable discretion" and is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22, 32 (2008). To obtain a preliminary injunction, a plaintiff must demonstrate (1) that he is likely to succeed on the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in his favor, and (4) that an injunction is in the public interest. *Id.* at 20; *Earth Island Inst. v. Carlton*, 626 F.3d 462, 469 (9th Cir. 2010). As to the

---

[2] The Piatelli Company, Inc., Hunt Brothers Producing Company, Inc., and Jack Gibson Frost, Inc. are also named as plaintiffs in this action. These are all corporations that are owned and operated by the Investors through which they either made the investment in the Mine or to which they transferred their interest in the Mine shortly after signing the Operating Agreement. (Piatelli Decl. (#7) at 24; Hunt Decl. (#7) at 138; Frost Decl. (#7) at 133).

[3] The motion was originally filed seeking a temporary restraining order and preliminary injunction. Defendants were then given notice of the complaint and the motion for injunctive relief and the parties then voluntarily entered into discussions to resolve the matter. These earlier discussions failed and now, as Defendants have notice of the action, the Investors seek a preliminary injunction.

second element, the plaintiff must show that irreparable harm is likely, not just possible. *Winter*, 555 U.S. at 22.

## DISCUSSION

The Investors are likely to succeed on the merits on their claims for breach of contract, breach of the covenant of good faith and fair dealing, breach of fiduciary duty, interference with contractual relations, and interference with prospective economic advantage. Both written and oral agreements were made between the Investors and Chambers that they would develop the geological information regarding the gold reserve and profitability of mining and then market the Mine for a price between $3,000,000 and $5,000,000. (Piatelli Decl. (#7) at 24; Joint Agreement (#7) at 41). Despite this agreement and the fiduciary duty he owes to the other members of Lucky Boy, Chambers and his wife have attempted to sabotage the sale of the Mine. They have prevented the due diligence from proceeding, disrupted presentations to the potential buyer, raised significant doubts in the minds of Yasheng representatives regarding Lucky Boy's title to the Mine, offered another mine to Yasheng that is not owned by Lucky Boy as an alternative purchase, harassed Yasheng executives and representatives, and stated that the Mine had been operating without the proper permits, potentially exposing a purchaser to liability. These actions may significantly damage the Investors if not enjoined, as they have expended a great amount of energy over a five year period to find a qualified buyer and may lose the sale due to Defendants' conduct. Accordingly, it is likely the Investors will succeed on the claims relevant to the preliminary injunction.

It is also likely that the Investors will suffer irreparable harm from Defendants' actions if a preliminary injunction is not issued. Piatelli is a prominent real estate broker and auctioneer with over fifty years of experience, and Frost is an advertising expert. (Piatelli Decl. (#7) at 25). Despite their expertise and diligent efforts, they have only been able to find one qualified buyer for the Mine, which is Yasheng. Yasheng however cannot proceed with its due diligence as Summit Engineering has stated it will not perform the work on the Mine while Chambers is present because they do not believe he can operate the mine responsibly, legally, or safely. (Gallagher Decl. (#7) at 162-63; Baumann Decl. (#7) at 164). Under the

lease agreements, Yasheng only has a limited time period in which it may conduct its due diligence and exercise its options. (Option to Lease (#7) at 114; Lease and Purchase Option Agreement (#7) at 121). Yasheng executives have additionally stated that it will not go forward with the purchase of the Mine if Defendants continue to contact its representatives or are at the Mine at any time its representatives or consultants are present. (Asai Decl. (#7) at 160). Absent a preliminary injunction Lucky Boy faces a significant risk of losing this deal. As it took Lucky Boy five years to find a single qualified buyer of the Mine, if this deal is lost it is unlikely that another buyer will be found. This is especially true if the industry learns that a qualified buyer backed out of the deal because there was a dispute among Lucky Boy's members, a prominent member prevented the qualified buyer from conducting due diligence, a buyer may be liable if it is true that Chambers has operated the Mine in an unsafe or illegal manner, and there were questions regarding Lucky Boy's title to the Mine. Irreparable harm is therefore probable absent injunctive relief.

The balance of equities also tips in favor of the granting of an injunction. The requested injunction would merely prevent Defendants from entering the Mine during the period Yasheng leases the Mine and conducts due diligence, from contacting Yasheng representatives and consultants, and otherwise interfering with Lucky Boy's contractual relations with Yasheng. (Mot. for Preliminary Injunction (#7) at 2-3). Defendants are unlikely to be significantly harmed by such an injunction. However, absent an injunction Lucky Boy is at serious risk of losing a multi-million dollar sale contract which took over five years of aggressive marketing to develop. Lucky Boy also risks serious harm to its reputation which may deter others from purchasing the Mine in the future. Given the slight disruption (if any at all) Defendants would suffer from the issuance of an injunction and the serious financial and reputational harm faced by Lucky Boy and the Investors, the balance of equities tip in favor of granting the injunction.

The injunction would also be in the public interest as it enforces contractual rights, prevents interference with contractual relations, and furthers the sale of the Mine, which would bring a major interest into the operation of the Mine, benefitting the local economy and state and local governments.

The Court accordingly holds that a preliminary injunction shall be issued in this matter. As agreed by the parties at the hearing held on May 3, 2012, Chambers will have fourteen (14) days from the date the preliminary injunction is issued to remove his equipment from the property and will be allowed to return when this action is decided or Yasheng no longer has contractual rights to the Mine.

Finally, the Court finds that no bond is required under Fed. R. Civ. P. 65. Defendants will not be significantly harmed financially or in other way from the injunction. Indeed, Chambers is likely to profit substantially if the injunction is issued and the Mine sold as he owns eighty percent of Lucky Boy and thus is entitled to a large share of the profits resulting from the sale.

## CONCLUSION

For the foregoing reasons, IT IS ORDERED that the Investors' motion for a preliminary injunction (#7) is GRANTED.

IT IS FURTHER ORDERED that Defendants are enjoined from entering the Mine at any time from fourteen (14) days after the date the preliminary injunction was issued through any period that Yasheng has a contractual right to: (1) conduct its due diligence relating to the Mine; (2) exercise an option to lease the Mine; (3) the lease term if Yasheng exercises such option; and (4) any time during which Yasheng has a contractual right to purchase the Mine.

IT IS FURTHER ORDERED that Defendants are enjoined from taking any actions which might interfere with any contract between Lucky Boy and Yasheng, including, but not limited to: (1) directly or indirectly contacting Yasheng, its directors, officers, managers, employees, agents, professional consultants, shareholders, or representatives in person, by telephone, by e-mail, by text message, by facsimile, or in any other manner; (2) making any defamatory statements about Lucky Boy, the Investors, or Yasheng; or (3) purporting to take any actions on behalf of Lucky Boy without first complying with the requirements of Lucky Boy's Operating Agreement.

DATED: This 11th day of May, 2012.

_____
United States District Judge