UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

| | |
|---|---|
| THE PIATELLI COMPANY, INC., et al., | )<br>)<br>)<br>) 3:12-cv-225-RCJ-WGC<br>)<br>) ORDER<br>)<br>)<br>)<br>)<br>) |
| Plaintiffs, | |
| vs. | |
| ALAN CHAMBERS and LAURA CHAMBERS, | |
| Defendants. | |

This Case involves a dispute between members of an LLC regarding an attempt to sell a gold mine. Defendants have moved for partial summary judgment (ECF No. 32). For the reasons stated herein, the motion is denied.

I.   BACKGROUND AND PROCEDURAL HISTORY

In late 2006 and early 2007, Defendant Alan Chambers ("Chambers") sought to have Mario Piatelli, Jack Frost, Robert Dierking, and J.D. Hunt (the "Investors" or "Plaintiffs") invest in his 800-acre gold mine (the "Mine") located near Hawthorne, Nevada. (Piatelli Decl., ECF No. 7, at 24).[1] On March 8, 2007 Chambers and the Investors executed a joint agreement (the "Joint Agreement"). (*Id.*; Joint Agreement, ECF No. 7, at 40). Pursuant to the Joint Agreement, Chambers conveyed the Mine to the recently formed Lucky Boy Mining and Development, LLC ("Lucky Boy") in exchange for an 80% ownership interest in Lucky Boy and, among other benefits, $30,000 from the Investors. (Piatelli Decl., ECF No. 7, at 26). An operating agreement

---

[1] The Court takes Judicial Notice of the declarations filed in support of Plaintiffs' April 26, 2012 motion for injunction ( ECF No. 7).

(the "Operating Agreement") executed the same day provided that Lucky Boy would be managed and controlled by a management committee consisting of all five of its members.[2] (Operating Agreement, ECF No. 7, at 45–46). A majority vote of the members was to control all aspects of managing the company, (*Id.* at 51), and Piatelli was appointed as president by a majority of the members. (Piatelli Decl., ECF No. 7, at 25). The members agreed that Lucky Boy's purpose was to prove the profitability of the Mine and market it for a price ranging from $3,000,000 to $5,000,000. (*Id.* at 24; Joint Agreement, ECF No. 7, at 41).

In 2006, prior to the execution of the Joint Agreement, Chambers apparently executed a commission agreement (the "Commission Agreement") with the Piatelli Company, wherein he agreed to pay a ten-percent commission to Piatelli, provided that Piatelli produced a ready, willing, and able buyer. During his deposition, Chambers repeatedly denied the existence of the Commission Agreement until the fully executed document was presented to him, at which point he admitted signing it. (Chambers Dep., ECF No. 33, at 42–45).

Shortly after Lucky Boy's formation Piatelli and Frost began an aggressive program to find a large investor or buyer. (Piatelli Decl., ECF No. 7, at 25). During a five-year period from March 2007 to March 2012, Piatelli and Frost created advertising materials and marketed the property to dozens of prospective purchasers around world. (*Id.* at 28). Although the pair received multiple offers, most of the prospective purchasers were not qualified buyers, but were instead interested in packaging a deal to sell stock. (*Id.*).

During this period, Chambers apparently operated the Mine without any permits and

---

[2] The Court notes that Chambers denies ever signing the Operating Agreement, (Chambers Dep., ECF No. 32-3, at 58–59), and that the Investors contest this denial, (Hunt Decl., ECF No. 7, at 138).

without providing an accounting to the Investors, failed to respond to requests for information from the Investors, locked the Mine and refused to provide a key to the Investors, denied the Investors the ability to inspect the Mine, and even attempted to sell the Mine without the approval of the Investors. (Frost Decl., ECF No. 7, at 135–36).

Early in 2007, Lucky Boy retained the services of geologist Chris Shaw ("Shaw"), who investigated certain portions of the mining property, obtained samples, and prepared geological reports. While investigating the property, Shaw was able to enter a large open shaft (the "Shaft") and take samples and photographs of a visibly large vein of gold, which revealed significant information about the value of the mine. (Shaw Decl., ECF No. 7, at 146–152).

In late 2010, Dr. Victor Asai—a representative of The Yasheng Group ("Yasheng")—contacted Piatelli and Frost to discuss the Mine. (Asai Decl., ECF No. 7, at 153). After initial discussions about the Mine, the chairman and president of Yasheng agreed to visit the Mine on November 18, 2011. (Piatelli Decl., ECF No. 7, at 25). Dierking contacted Chambers and asked him open the Mine for the visit. He further explained that Yasheng was interested in purchasing the Mine. (Dierking Decl., ECF No. 7, at 143). Chambers reacted negatively to this information and stated he did not want to sell the property. (*Id.*).

During Yasheng's November, 2011 visit to the Mine, Dierking observed that Chambers had begun to fill the Shaft containing the visible vein of gold. (*Id.*). Contrary Dierking's onsite observation, Chambers testified, in his deposition, that he had totally closed the Shaft six months prior to the November, 2011 visit.[3] (Chambers Dep., ECF No. 33, at 37–38).

---

[3] Prior to the November, 2011 visit, Piatelli was negotiating with a different prospective buyer. On October 26, 2011, Piatelli described the proposed transaction in an email to Chambers. Later that day, Chambers and his wife, Defendant Laura Chambers responded with an email stating

3

In February 2012, Yasheng and Lucky Boy entered into an Option to Lease agreement and a Lease and Purchase Option agreement. (Option to Lease, ECF No. 7, at 114; Lease and Purchase Option Agreement, ECF No. 7, at 121). The Option to Lease agreement provided a ninety-day period for Yasheng to conduct an in-depth investigation of the Mine, and if satisfactory, Yasheng could elect to lease the Mine under the Lease and Purchase Option agreement by paying $500,000. If Yasheng leased the Mine, it could then, at any time during the eighteen-month lease period, exercise its option to purchase by paying the balance of $4,000,000. (*Id.*). The Option to Lease did not permit Yasheng to extract ore. (*Id.*).

On March 6, 2012, Dr. Asai called Chambers to arrange for him to open the Mine for Yasheng's executives and professionals. (Asai Decl., ECF No. 7, at 155). During that conversation, Chambers represented that he owned 80% of the Mine itself (not of Lucky Boy) and that he would not open the Mine unless he saw a contract. (*Id.*). The Parties agreed to a meeting on March 8, 2012, in Hawthorn, Nevada, between the president and chairman of the Yasheng board, four of Yasheng's geologists, Dr. Asai, Lucky Boy's geologist, and two professional companies from which Yasheng sought proposals for the due diligence work (Summit Engineering and Broadbent Environmental). (*Id*. at 156).

During the meeting, the group desired to see the visible vein of gold in the Shaft, (*Id*. at 157), but Chambers told the group that they could not get to the Shaft because it was "all snowed in." (*Id*.). Nonetheless, the group proceeded to the Shaft and found it filled-in with dirt. (*Id*.). When Dr. Asai asked where the Shaft was located, Chambers responded "you are on top of it."

---

that Piatelli should no longer contact them, that they had their own deals, and that they did not need the partners anymore. At his deposition, Chambers denied knowledge of the responsive email, (Chambers Dep., ECF No. 33, at 49–50), but Laura Chambers has testified that Chambers dictated it to her, ( L. Chambers Dep., ECF No. 33, at 77–79).

(*Id.*). The group had apparently driven over it without Chambers warning them of the potential danger. (*Id.*). Chambers claimed that he filled the Shaft because of the risk of earthquakes, (*Id.*), but prior to his actions, the Shaft had been open for sixty to seventy years without any earthquake-related harm. (Shaw Decl., ECF No. 7, at 147–48). Because of Chambers actions, the group was unable to view the prominent vein of gold it desired to inspect.

After the visit to the Mine, the group met at the nearby El Capitan hotel, where Shaw gave a presentation about the Mine. (Dierking Decl., ECF No. 7, at 144). During this meeting, both Chambers and his wife were very disruptive, claiming that they owned 80% of the Mine, knew nothing of any contract between Lucky Boy and Yasheng, that the Mine did not have the proper permits, that Piatelli had forged the deed to the Mine, and that criminal charges and a lawsuit were being filed against him. (*Id.*; Asai Decl., ECF No. 7, at 158). Chambers and his wife were apparently so disruptive during the visit and subsequent meeting that the chairman and CEO of Summit Engineering informed Dr. Asai that Summit was unwilling to perform the due diligence work while Chambers was present, because he believed that Chambers would not behave safely, responsibly, or legally at the Mine. (Gallagher Decl., ECF No.7, at 162–63).

In fact, Chambers and his wife created such doubt in the minds of the Yasheng executives that Dr. Asai decided to drive to Los Angeles to meet with Piatelli and determine Chambers' authority. (Asai Decl., ECF No. 7, at 159). Before Dr. Asai departed, Chambers and his wife approached him and told him that Chambers had another mine for sale, which he would offer to sell to Yasheng. (*Id.*). In response, Dr. Asai explained that there would be no further discussions until Lucky Boy resolved its internal conflict. (*Id.*).

In Los Angeles, Piatelli provided Dr. Asai with copies of the deed and the Lucky Boy

5

Operating Agreement, which authorized a majority of the management committee to make decisions. (*Id.*). When Dr. Asai returned to Hawthorn, Laura Chambers again approached him, stating that she and Chambers wanted to buy out their partners and do the mining project with Yasheng, but that they would not pull any permits because they did not want the state to know what they were doing. (*Id*. at 160). Dr. Asai told her to stop talking and explained that Yasheng required all proper permits. (*Id*. at 160). Since that time, Chambers has repeatedly attempted to negotiate with Yasheng's president by telephone. (Piatelli Decl., ECF No. 7, at 33).

In early April, 2012 Piatelli sent a copy of the Yasheng transaction documents to all members, including Chambers. The documents were executed by members Frost, Dierking, and Hunt on or about April 7, 2012. Chambers refused to sign the documents, but he admits that he received them. (Chambers Dep., ECF No. 33, at 45–48).

On July 26, 2012, Lucky Boy held a duly noticed members' meeting, via conference call, to ratify certain actions taken by Lucky Boy, including the execution of the Yasheng Agreement, and allow for needed discussion between the members. All of Lucky Boy's members participated in the conference call, including Chambers and his counsel, Attorney Brohawn. Chambers, however, expressed an objection to the meeting and claimed that he was participating under protest. Near the end of the meeting, after discussion on various agenda items, Piatelli called for a vote to ratify the Yasheng Agreement and approve the other items on the agenda. Four of the members voted "Aye," and Chambers voted "No." Chambers then restated his objections to the meeting. (Tr. July 26, 2012 Members Meeting, ECF No. 33-1, 80–97).

On April 23, 2012, the Investors[4] filed a complaint in this Court against Alan and Laura Chambers (collectively "Defendants"), alleging (1) breach of contract; (2) breach of the implied covenant of good faith and fair dealing; (3) breach of fiduciary duty; (4) interference with contractual relations; (5) interference with prospective economic advantage; and (6) defamation. (ECF No. 1). On April 26, 2012, the Investors filed a motion for a preliminary injunction, which this Court granted in an order dated May 11, 2012. (ECF No. 21). Specifically, the Court enjoined Defendants form, among other things, taking any actions that might interfere with any contract between Lucky Boy and Yasheng. (*Id.* at 8).

On April 10, 2013, Defendants filed the pending motion for partial summary judgment, contending that they are entitled to judgment as a matter of law on all claims other than (1) Piatelli's claim for defamation, and (2) the claims for a proportionate share of unreimbursed regular operating expenses. (ECF No. 32). The Investors filed a response on April 25, 2013, (ECF No. 33), and the Court held a hearing on January 21, 2014.

## II. LEGAL STANDARDS

In reviewing a motion for summary judgment, the court construes the evidence in the light most favorable to the nonmoving party. *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir. 1996). Pursuant to Fed.R.Civ.P. 56, a court will grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). Material facts are "facts that might affect the outcome of the

---

[4] The Piatelli Company, Inc., Hunt Brothers Producing Company, Inc., and Jack Gibson Frost, Inc. are also named as plaintiffs in this action. These are all corporations that are owned and operated by the individual Investors, through which the Investors either made the investment or to which they later transferred their interest in the LLC. (Piatelli Decl., ECF No. 7, at 24; Hunt Decl., ECF No. 7, at 138; Frost Decl., ECF No. 7, at 33).

suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.*

The moving party bears the initial burden of identifying the portions of the pleadings and evidence that the party believes to demonstrate the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). A party asserting that a fact cannot be or is genuinely disputed must support the assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)-(B). Once the moving party has properly supported the motion, the burden shifts to the nonmoving party to come forward with specific facts showing that a genuine issue for trial exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252, 106 S.Ct. at 2512. The nonmoving party cannot defeat a motion for summary judgment "by relying solely on conclusory allegations unsupported by factual data." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356.

### III. ANALYSIS

Defendants contend that they are entitled to summary judgment as a matter of law on all of the claims arising out of the Joint Agreement and the Lucky Boy Operating Agreement. The Court disagrees. Defendants' motion can be reduced to two arguments, neither of which are persuasive: (1) The Investors' contract with Yasheng was unauthorized under the Operating Agreement and therefore constituted a breach of contract, which excused any breach of contract committed by Defendants; and (2) Because the Investors have failed to designate experts in this case, they are unable to prove damages as a matter of law. (*See* ECF No. 32, at 7–11).

**a. Breach of Contract**

Turning first to the breach of contract argument,[5] Defendant contends that the Investors entered into the Yasheng Agreement without the approval of a majority vote of Lucky Boy's members, in violation of paragraph 6.2 of the Operating Agreement,[6] and that the Investors concealed the Yasheng transaction documents from them. These actions, Defendants claim, constituted a breach of contract sufficient to excuse Defendants from liability under the LLC Agreements. However, the undisputed evidence reveals that the Yasheng Agreement was approved by a majority vote, which satisfied paragraph 6.2's requirements, and that even if the vote was procedurally defective, it was duly ratified on July 26, 2012. Moreover, Chambers' own

---

[5] Although Defendants dispute Plaintiff's allegation that Chambers signed the Operating Agreement, they contend that Plaintiff's "breached their own Operating Agreement as a matter of law," and that this somehow excuses Defendants' alleged conduct. (Mot. Summ. J., ECF No. 32, at 7).

[6] Paragraph 6.2 provides, in relevant part, "no Member will have authority to cause the Company to engage in the following transactions without first obtaining the approval of a Majority vote of the Members . . . the sale, exchange or other disposition of all, or substantially all of the Company's assets." (Operating Agreement, ECF No. 7, at 52).

testimony plainly demonstrates that the Investors did not conceal the Yasheng transaction from him, and Defendants' attempt to persuade this Court otherwise boarders on misleading.

As an initial matter, because Defendants do not dispute the fact that four of the five members executed the transaction documents, (*See* Chambers Dep., ECF No. 33, at 45–48), they apparently assume that this did not constitute the majority "vote" required under paragraph 6.2. This assumption is incorrect. Paragraph 6.3 provides,

> No annual or regular meetings of the Members are required to be held. However, if such meetings are held, such meetings will be noticed, held and conducted pursuant to the Act. *In any instance in which the approval of the Members is required under this Agreement, such approval may be obtained in any manner permitted by the Act*, except that proxies shall not be allowed. Unless otherwise provided in this Agreement, approval of the Members will mean the approval of a Majority vote of the Members.

(Operating Agreement, ECF No. 7, at 55) (emphasis added). Paragraph 2.1 provides that the term "Act" refers to the Beverly Killea Limited Liability Act, Cal. Corp. Code § 17000, et seq., which governs California limited liability companies. (*Id.* at 46). Section 17001 of the Act expressly provides that the term "'vote' includes authorization by written consent." Nevada's analogous statute likewise defines "vote" to include actions constituting "written consent." Nev. Rev. Stat.§ 78.010(a). Therefore, whether the Court applies the Beverly Killea Act, as the Operating Agreement directs, or NRS 78.010, it must conclude that the majority "vote" or "approval" required under paragraph 6.2 can be accomplished by written consent. As noted above, it is undisputed that in April of 2012, four of the five members of Lucky Boy, a clear majority,[7] signed the Yasheng Agreement. These signatures unquestionably constituted written consent.

---

[7] While Defendants repeatedly make a point of the fact that Chambers has an 80% ownership interest in the LLC, the Court notes that he does not have an 80% membership, i.e., voting, interest. Chambers, like each of the other members, has a 20% membership interest.

Therefore, the Court finds, as a matter of law, that the Yasheng Agreement was approved by a majority vote of the members.

Moreover, even if the written "vote" was somehow defective under the Operating Agreement, it was cured by the July 26, 2012 ratification. Under both Nevada and California law, "contract ratification is the adoption of a previously formed contract, notwithstanding a quality that rendered it relatively void." *Merrill v. DeMott*, 951 P.2d 1040, 1044 (Nev. 1997) (internal citations and quotation marks omitted); *Kraft v. Wilson*, 37 P. 790, 792 (Cal. 1894) ("Ratification is the adoption of a previously formed contract, notwithstanding a vice which rendered it relatively void; and, by the very nature of the act of ratification, confirmation, or affirmance, the party confirming becomes a party to the contract."). Moreover, "[r]atification relates back and is equivalent to prior authority to make the contract." *Clark Realty Co. v. Douglas*, 212 P. 466, 467 (1923). Defendants do not dispute that a majority of Lucky Boy's members voted to ratify the Yasheng Agreement. (*See* Mot. Summ. J., ECF No. 32, at 4). Therefore, they cannot seriously maintain that it was unauthorized, and thus violated the Operating Agreement, at the time of execution. Indeed, both by reason of the majority's written consent and the majority's ratification, Defendants' breach of contract claim is meritless.

Defendants also attempt to excuse their alleged conduct by claiming that "Plaintiff Piatelli affirmatively concealed the existence of the signed Yasheng contract." (Mot. Summ. J., ECF No. 32, at 6). The Court not only rejects this argument, it finds that it mischaracterizes the undisputed facts and is somewhat misleading. Defendants base this argument on an email from Plaintiff Piatelli to geologist Shaw dated February 9, 2012, which states in relevant part,

This is a Confidential Memo to You at this time. A) The Chairman (Big Boss) of

> the Yasheng Corporation has signed our Sale Agreement as of TODAY. B) Please DO NOT, repeat DO NOT say anything to ALAN at this time. We do not want Alan or his GREEDY WIFE causing any trouble and screw up the deal.

(Mot. Summ. J., ECF No. 32, at 6–11 (quoting Email, ECF No. 32-6)). Defendants make no effort to discuss this email in the relevant context. Instead, they quote it without explanation, apparently hoping that the Court will read it in vacuum and find that it excuses the alleged behavior. The Court is not impressed. This email does not reflect conduct that would excuse the alleged behavior; it reflects a reasonable fear of the alleged behavior.

As a starting point, the Court notes that Defendants admit that in November, 2011 they sent an email to Piatelli unambiguously directing him to cease contacting them about potential deals to sell the Mine. ( L. Chambers Dep., ECF No. 33, at 79). Furthermore, and contrary to the obviously intended implication, Piatelli's email does not evidence an intent to keep Chambers from voting on the deal, but instead attempts to prevent him from sabotaging it. Poignantly, it requests that Shaw not reveal the information to Chambers "at this time." (ECF No. 32-6). More importantly, Chambers admits that (1) in November, 2011 he was aware that a majority of the members supported the potential deal with Yasheng, (Chambers Dep., ECF No. 33, at 50–51); (2) he knew about the Option to Lease before the March 8, 2012 meeting between representatives of Lucky Boy and Yasheng, (*Id.*); (3) in April, 2012, he had an opportunity to sign the transaction documents, and thereby vote on the transaction, (*Id.* at 45–48); and (4) he participated in a meeting during which the deal was ratified by a majority vote, (*See* Mot. Summ. J., ECF No. 32, at 4). Therefore, Defendants' reliance Piatelli's email for the implied proposition that Chambers was deliberately kept from expressing his views on the deal, and that this somehow affected the majority's decision to execute it, is not only unpersuasive, it is a

12

mischaracterization of the email itself and the facts of this case.

Finally, even assuming, *arguendo*, that the Yasheng contract is not valid, its execution most certainly would not excuse the behavior alleged in the causes of action presently at issue. Defendants' sole argument on this point is that is "[i]t is a principle of fundamental justice that if a promisor is himself the cause of the failure of performance, either of an obligation due him or of a condition upon which his own liability depends, he cannot take advantage of the failure."(*See id* at 7 (quoting *Cladianos v. Friedhoff*, 240 P.2d 208, 210 (1952))). While the Court agrees with this rule generally, it is entirely inapplicable to this case. Indeed, there is nothing in the record from which the Court could conclude that the Investors caused the culpable behavior alleged.[8] Even if the investors were without authority to execute the Yasheng agreement, which is plainly not the case, paragraph 6.2 simply does not create an enforceable duty as to the Defendants personally or impose a condition upon which their liability depends. Instead, it simply defines the situations in which members are without authority to bind the LLC (i.e., situations in which a disputed agreement is voidable). Therefore, Defendants cannot be heard to argue that an alleged violation of paragraph 6.2 excuses the conduct at issue in this case.

**b. Damages**

Defendants next argue that because the Investors have not designated an expert witness, they cannot put on any evidence of damages related to the Operating Agreement. This argument is poorly researched and poorly reasoned.

Under Federal Rule of Evidence 701, lay opinion is admissible when it is "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or

---

[8] In fact, as explained above, the record actually supports the conclusion that it was Defendants conduct that caused the Investors to engage in the behavior of which Defendants now complain.

to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."

While the Court acknowledges that proving some of the damages claimed in this case could require expert testimony, Defendants have failed to make a meaningful attempt identify those damages or demonstrate why they would require specialized knowledge. Moreover, it is possible, even likely, that expert testimony will not be required at all. If, for example, the Investors prove that Defendants' conduct merely delayed the sale of the Mine, the damages will presumably be based on the calculated interest, and such calculations do not require special expertise. Thus, at this point, it is simply not clear that the Investors will be required to put on expert testimony.

Furthermore, even if expert testimony is required, and the deadline for Rule 26(a)(2) disclosures has passed, the Court is not bound to exclude it. Indeed, Rule 37(c)(1), gives the Court broad discretion in this area:

> (1) *Failure to Disclose or Supplement.* If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless. In addition to or instead of this sanction, the court, on motion and after giving an opportunity to be heard:
> (A) may order payment of the reasonable expenses, including attorney's fees, caused by the failure;
> (B) may inform the jury of the party's failure; and
> (C) may impose other appropriate sanctions . . . .

Fed. R. Civ. P. 37.

Stated simply, Defendants have assumed what they intended to conclude: (1) that expert testimony is unquestionably required in this case, and (2) that the Court must exclude it as a

14

matter of law. These assumptions, however, confuse well settled procedural and evidentiary rules. In the event that expert testimony is required in this case, the Court may still allow it. Therefore, Defendants are not entitled to judgment as a matter of law, and the motion for partial summary judgment is denied.

## CONCLUSION

IT IS HEREBY ORDERED that Defendants' motion for partial summary judgment (ECF NO. 32) is DENIED.

Dated: January 6, 2014

_____
ROBERT C. JONES
United States District Judge